UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| CAMBRIDGE PLACE GROUP, LLC, *et al.*, | ) ) ) | Civil No. 5:22-cv-00112-GFVT |
| Plaintiffs, | ) ) | |
| v. | ) ) | **OPINION** |
| LEE SAINT MARTIN, | ) ) | **&** **ORDER** |
| Defendant. | ) ) ) | |

*** *** *** ***

This matter is before the Court on a Motion to Compel Arbitration [R. 1] and a Motion to Dismiss. [R. 11.] The Plaintiffs, a nursing home and its owners, ask the Court to enforce an arbitration agreement signed on behalf of Defendant Lee Saint Martin. Seeking dismissal, Mr. Saint Martin makes several jurisdictional arguments that courts in this district routinely deny. He then attacks the validity of the arbitration agreement, which his brother signed pursuant to a durable power of attorney. The controversy turns on whether the power to sign an arbitration agreement was within the scope of authority that Mr. Saint Martin conferred on his brother. The Kentucky Supreme Court recently created a rule that distinguishes between authorization to bind Mr. Saint Martin to arbitrate claims that existed at the time the power of attorney was signed and any disputes that arose thereafter. Because this distinction targets arbitration agreements based on one of their defining features—waiver of future litigation in court—it is preempted by the Federal Arbitration Act. With the offending rule excised, the residuum of Kentucky law would find signing an arbitration agreement to be within the scope of Mr. Saint Martin's power of attorney. For these reasons, Mr. Saint Martin's Motion to Dismiss **[R. 11]** is **DENIED** and the Petitioners' Motion to Compel Arbitration **[R. 1]** is **GRANTED**.

**I**

In 2013, Mr. Saint Martin signed a durable power of attorney form that named his

brother, Alvin Q. Wilson, his attorney-in-fact.[1]  [R. 1-4.]  In February 2021, Cambridge Place, a

long-term care facility in Lexington, Kentucky, admitted Mr. Saint Martin as a resident.  [R. 11-1

at 1; R. 12 at 1.]  At that time, Mr. Wilson signed an agreement on Mr. Saint Martin's behalf that

required Cambridge Place and Mr. Saint Martin to resolve any claims for violations of tort law or

statutory duties via arbitration.  [R. 1-2 at 2.]

Prior to moving into Cambridge Place, Mr. Saint Martin allegedly suffered from diabetes

and peripheral vascular disease, resulting in the amputation of his right leg and the fifth toe of his

left foot.  [R. 12 at 2.]  While living in Cambridge Place, Mr. Saint Martin alleges that he

suffered ulceration of his foot, cellulitis, osteomyelitis, and the amputation of the fourth toe of

his left foot.  *Id.*; [R. 1-3 at 6.]  In February 2022, Mr. Saint Martin sued Cambridge Place, Jay

Frances, and Kimberly Smith in Fayette Circuit Court for negligence and violation of his

statutory rights as a resident of a long-term care facility in Kentucky.  [R. 1-3 at 3–4, 7, 14]; Ky.

Rev. Stat. Ann. § 216.515 (LexisNexis 2023).

On May 2, 2022, Cambridge Place, Mr. Frances, and Ms. Smith filed the instant motion

to compel arbitration pursuant to Section Four of the Federal Arbitration Act.  [R. 1.]  Mr. Saint

Martin moves to dismiss the motion.  [R. 11.]  He argues that the Court lacks jurisdiction to hear

the case, that the motion must be dismissed for failure to join an indispensable party, and that the

Court should abstain from considering the claim.  *Id.*  Because he believes the power of attorney

---

[1] The Court notes some confusion in the record as to the appropriate pronouns for Saint Martin.  Saint Martin's
attorneys have used both male and female pronouns to refer to Saint Martin.  [*Compare* R. 1-3 at 6 ("Lee Saint
Martin suffered accelerated deterioration of *her* health . . . ." (emphasis added), *with id.* ("Defendants failed to
discharge their obligations of care to Lee Saint Martin, and in so failing, displayed a conscious disregard for *his*
rights . . . .") (emphasis added).]  Because use of the male pronouns appears to be more common throughout both
parties' briefing, the Court refers to the Defendant as Mr. Saint Martin.

2

that he granted his brother did not cover arbitration agreements, Mr. Saint Martin also seeks dismissal for failure to state a claim for which relief can be granted. *Id.* The matter is fully briefed and ripe for review. [R. 12; R. 17.]

## II

As a preliminary matter, the Court must determine the applicable standard of review. Mr. Saint Martin styles his motion under Federal Rules of Civil Procedure 12(b)(1) (jurisdiction), 12(b)(7) (joinder), and 12(b)(6) (failure to state a claim). But the Federal Rules of Civil Procedure do not fully govern actions under the Federal Arbitration Act. *See Boykin v. Family Dollar Stores of Mich., LLC*, 3 F.4th 832, 835 (6th Cir. 2021). Instead, the Act supplants conflicting Rules of Procedure. *Id.* The Rules serve only as gap-fillers where the Act is silent. *Id.* at 837.

This Court has previously considered motions to dismiss Section Four cases under Rules 12(b)(1) and 12(b)(7). *Blc Lexington Snf v. Petersen*, No. 5:19-cv-00465-GFVT, 2020 U.S. Dist. LEXIS 103179, at *2 (E.D. Ky. June 12, 2020). The parties provided the Court no reason to suspect that the FAA displaces these rules. However, the Sixth Circuit recently rejected the applicability of Rule 12(b)(6) in a similar context. *See Boykin*, 4 F.4th at 838.

Rule 12(b)(6) is inapplicable to a motion to compel arbitration under Section Four of the FAA where the parties invite the court to consider evidence outside of the four corners of the complaint. *Id.* Section Four allows a court to "consider only narrow issues: those 'relating to the making and performance of the agreement to arbitrate.'" *Id.* at 837 (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967)). Here, the parties ask the Court to consider the scope of a power of attorney incident to the making of the arbitration agreement. [R. 11-1 at 18.] To consider this material outside of the complaint, the Sixth Circuit requires the

Court to apply the lens of Rule 56, which governs summary judgment.  *See Boykin*, 4 F.4th at 838.

Accordingly, the Court will assess the arguments for dismissal under the procedures applicable to Rules 12(b)(1), 12(b)(7), and 56.  As it must, the Court first examines the jurisdictional arguments.  Then, attention turns to the substantive challenge regarding formation of the arbitration agreement under the summary judgment standard.

### A

"We have been here before."  *Richmond Health Facilities—Madison, L.P. v. Shearer*, No. 5:17-cv-00255, 2017 WL 3273381, *1 (E.D. Ky. 2017) (Caldwell, J.).  A resident of a nursing home alleges tort claims against the facility in state court.  *Compare id., with* [R. 1-3.]  An arbitration agreement exists.  *Compare Shearer*, 2017 WL 3273381, *1, *with* [R. 1-2.]  The state-court defendant asks a federal court to mandate arbitration.  *Compare Shearer*, 2017 WL 3273381, *1, *with* [R. 1.]  The state-court plaintiff then moves to dismiss on the following grounds: lack of subject-matter jurisdiction, failure to join indispensable parties, and abstention.  *Compare Shearer*, 2017 WL 3273381, *1, *with* [R. 11.]

If this feels like a pattern, it should.  These arguments have been unsuccessfully raised before nearly every Judge in this district several times.  *Shearer*, 2017 WL 3273381, *1; *see also Petersen*, 2020 U.S. Dist. LEXIS 103179, at *9 (collecting cases).  Mr. Saint Martin breaks no new ground.

### 1

The Court has valid subject matter jurisdiction over this case under Congress's grant of diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).  Mr. Saint Martin premises his argument against jurisdiction on the Supreme Court's decision in *Vaden v. Discover Bank*, 556 U.S. 49, 64

(2009).  [R. 11-1 at 3.]  The Court has declined to apply *Vaden* in several similar situations.  *See Petersen*, 2020 U.S. Dist. LEXIS 103179, at *9 (collecting cases).  Cambridge Place insists that this case is no different.  [R. 12 at 5.]

A motion to dismiss under Rule 12(b)(1) challenges the Court's jurisdiction to hear the case.  *Petersen*, 2020 U.S. Dist. LEXIS 103179, at *3.  When jurisdiction is challenged in a motion to dismiss, the burden is on the plaintiff to prove that jurisdiction exists.  *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996).  In this routine type of Rule 12(b)(1) motion, the Court assumes the allegations in the complaint are true and construes them in the light most favorable to the nonmoving party.  *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).

Section Four of the Federal Arbitration Act permits "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" to "petition any United States district court, which save for such agreement, would have jurisdiction under title 28, in a civil action . . . for an order directing that such arbitration proceed . . . ."  9 U.S.C. § 4.  Based on its plain language, Section Four does not, of its own accord, confer jurisdiction upon a federal court.  *Vaden*, 556 U.S. at 66.  Instead, there must be an independent basis for jurisdiction.  *Id.*; *see generally* 13D Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3569 (3d ed. 2023).

Frequently, parties present federal courts with Section Four petitions based on Congress's grant of diversity jurisdiction.  *See* Wright & Miller, *supra*, § 3569 ("Ordinarily the jurisdictional basis will be diversity of citizenship . . . .").  District courts have original jurisdiction over civil actions where the amount in controversy is greater than $75,000 and the litigation is between citizens of different states.  18 U.S.C. § 1332(a)(1).  More particularly, Congress's statutory

grant of diversity jurisdiction requires that no plaintiff share citizenship with any defendant. *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 n.3 (1996).

*Vaden*, on the other hand, concerned a Section Four petition grounded in the district courts' power to hear cases that present a substantial federal question. *Vaden*, 556 U.S. at 70; 28 U.S.C. § 1331. Under federal question jurisdiction, a substantial federal question must be present on the face of the plaintiff's well-pleaded complaint. *Caterpillar, Inc.*, 482 U.S. at 392. In violation of this rule, the alleged federal question in *Vaden* arose in a counterclaim. *Vaden*, 556 U.S. at 70. "Accordingly, the Supreme Court directed district courts to 'look through' the arbitration action and determine whether federal question jurisdiction exists based on the underlying state-court suit." *Brookdale Senior Living, Inc. v. Stacy*, 27 F. Supp. 3d 776, 781 (E.D. Ky. 2014) (Caldwell, J.).

Numerous opinions from this and other districts limit *Vaden's* holding to its facts and apply it only to Section Four petitions grounded on federal question jurisdiction. *See Petersen*, 2020 U.S. Dist. LEXIS 103179, at *9 (collecting cases). Rather than address this precedent, Mr. Saint Martin simply asks the Court to apply *Vaden's* holding and look to the underlying state court case to conclude that diversity jurisdiction is not present. [R. 11-1 at 4.] Using *Vaden's* "logic, it makes scant sense to allow some of the parties in this case to carve themselves out for separate resolution in this matter while other parties seek resolution of the same issue in the State Court Action." *Id.* at 6. Mr. Saint Martin alleges that he and Cara W. Clark, a defendant in state court who is not a part of the federal petition, are both citizens of Kentucky, which would be fatal to diversity jurisdiction. *Id.* at 7.

Courts that have considered similar arguments only entertain a possible jurisdictional issue if the allegedly missing, non-diverse party is indispensable under Rule 19. *See Northport*

*Health Servs. of Arkansas, LLC v. Rutherford*, 605 F.3d 483, 490–91 (8th Cir. 2010).  As

detailed in the following discussion, Ms. Clark is not an indispensable party to this petition.  *C.f.*,

*Petersen*, 2020 U.S. Dist. LEXIS 103179, at *17 (alleged nursing-home-administrator tortfeasors

were not indispensable parties to Section Four petition).  Accordingly, only the parties named in

this proceeding are relevant to the Court's subject matter jurisdiction.  *See Rutherford*, 605 F.3d

at 490–91.

The Court can validly exercise diversity jurisdiction over the present case given the

named parties.  For the purposes of diversity jurisdiction, the citizenship of a natural person is

determined by his domicile.  *Certain Interested Underwriters at Lloyd's v. Layne*, 26 F.3d 39, 41

(6th Cir. 1994).  A person acquires a domicile by being physically present in a state and

manifesting the intention to make it his home indefinitely or the absence of an intention to make

his home elsewhere.  *Stifel v. Hopkins*, 477 F.2d 1116, 1120 (6th Cir. 1973).  A natural person

has only one domicile for purposes of diversity jurisdiction.  *Eastman v. Univ. of Mich.*, 30 F.3d

670, 672–73 (6th Cir. 1994).

Corporations are citizens of any state in which they were incorporated and any state

where they have a principal place of business.  28 U.S.C. 1332(c)(1).  Limited liability

corporations are assessed differently.  *Varsity Brands, Inc. v. Star Athletica, LLC*, 799 F.3d 468,

494 (6th Cir. 2015).  LLCs do not receive "a fictional citizenship in their state of organization or

in their principal place of business."  *Yarber v. M.J. Elect., LLC*, 824 Fed. App'x 407, 409 (6th

Cir. 2020).  LLCs have the citizenship of each of their members.  *Mortensen Family Dental Ctr.,

Inc. v. Heartland Dental Care*, 526 F. App'x 506, 508 (6th Cir. 2013).

Analyzing jurisdiction under Section 1332 can become quite complicated when an LLC

is involved.  If an LLC has a corporation as a member, the LLC will be a citizen of the

corporation's state of incorporation and principal place of business.  *See Yarber*, 824 Fed. App'x at 410.  However, if an LLC has other LLCs as members, the party's citizenship resembles a Russian nesting doll.  *See id.* at 409.  The LLC at issue will have the citizenship of every member LLC it contains.  *Id.*  Accordingly, courts must trace "through however many layers of partners or members there may be" to determine the citizenship of the LLC that is a party to the case.  *Id.* (quoting *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 420 (3d Cir. 2010)).

The citizenship of the defendant in this case is simple.  Mr. Saint Martin moved into Legacy Place, which is in Kentucky, in 2021 and remains there to this day.  [*See* R. 12 at 1 n.2.] He is a citizen of Kentucky.  *See Stifel*, 477 F.2d at 1120.

The plaintiffs are completely diverse from Mr. Saint Martin as they are all citizens of Tennessee.  Ms. Smith resides in Martin, Tennessee, and Mr. Frances resides in Brentwood, Tennessee.  [R. 20-3 at 1.]  They are, therefore, citizens of the Volunteer State.  *See Stifel*, 477 F.2d at 1120.  Cambridge Place Group and Cambridge Place Properties are LLCs whose only members are Ms. Smith and Mr. Frances.  [R. 20 at 1–2.]  The LLCs inherit Ms. Smith and Mr. Frances's citizenship and are regarded as Tennesseans.  *See Yarber*, 824 Fed. App'x at 409–10. Given this posture, the controversy before the Court mirrors the Battle of the Barrel, purely Kentucky versus Tennessee.[2]  Mr. Saint Martin's argument for dismissal under the complete diversity requirement will be denied.[3]

## 2

Mr. Saint Martin makes one other argument that the Court should decline to hear the case.  He suggests that "[p]rinciples of comity direct that when separate courts are presented with

---

[2] *See generally* Ethan Levine, *Reliving the Rise and Fall of the "Battle of the Barrel"*, Saturday Down South (2015), https://www.saturdaydownsouth.com/sec-football/reliving-rise-fall-battle-barrel.
[3] Mr. Saint Martin did not challenge the satisfaction of the amount in controversy requirement.  [*See* R. 11-1 at 8.]

the same lawsuit, the court having jurisdiction over all matters in a dispute should be preferred to the court with only a subset of the whole." [R. 11-1 at 8 (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu*, 675 F.2d 1169, 1173 (11th Cir. 1982)).] This argument asks the Court to invoke the doctrine of abstention and permit the Fayette Circuit Court to determine whether the arbitration agreement is enforceable. Like Mr. Saint Martin's *Vaden* assertion, this reasoning is familiar and unpersuasive. *See Petersen*, 2020 U.S. Dist. LEXIS 103179, at *7–9.

The Sixth Circuit has rejected a similar argument for abstention under the line of cases stemming from *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976). *See PaineWebber, Inc. v. Cohen*, 276 F.3d 197, 206 (6th Cir. 2001). Generally, federal courts must exercise the jurisdiction given to them by Congress. *Id.* (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 15 (1983)). For this reason, "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Colo. River*, 424 U.S. at 817.

In rare cases, abstention from a matter that is subject to a concurrent state court proceeding is appropriate "based on 'considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" *PainWebber*, 276 F.3d at 206 (quoting *Colo. River*, 424 U.S. at 817). The Supreme Court has identified eight factors for district courts to consider regarding abstention in this scenario. *See id.* Mr. Saint Martin makes no attempt to apply these factors. [*See* R. 11-1 at 8–10.] On the other hand, both the Sixth Circuit and this Court have considered the eight factors under these circumstances and have concluded that abstention is not appropriate. *See PainWebber*, 276 F.3d at 206–09; *Peterson*, 2020 U.S. Dist. LEXIS 103179, at *7–9. Absent some argument to the contrary from Mr. Saint Martin, the Court assumes these decisions remain well reasoned. *See*

*McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

Instead, Mr. Saint Martin points the Court to two cases that are readily distinguishable from the present litigation.  First, Mr. Saint Martin cites *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu*, 675 F.2d 1169, 1173 (11th Cir. 1982).  *Haydu* involved a state court action that had twice come before a federal court under the FAA.  *See id.* at 1171–72.  By the second time Merrill Lynch sought to enforce arbitration in federal court, two important facts had developed. The plaintiff had amended his state court complaint to add a claim under the 1923 Securities Act that was not arbitrable, and the case had nearly progressed to trial before the state court.  *Id.* at 1172–73.  Given the advanced posture of the case in state court and the intertwined nature of the facts underlying the arbitrable and non-arbitrable claims, the Eleventh Circuit found that principles of comity required the federal court to yield to the state court.  *Id.* at 1173.

Neither factor is present here.  None of Mr. Saint Martin's state court claims are insulated from arbitration by law.  [R. 12 at 7.]  And, at the time of the motion to compel arbitration, the state court case remained at the pleading stage.  *Id.*  The Eleventh Circuit's decision has no bearing on this case.

Second, Mr. Saint Martin cites *Brillhart v. Excess Insurance Company of America*, 316 U.S. 491 (1942).  [R. 11-1 at 9.]  *Brillhart* concerned a decision by a district court as to whether to exercise discretionary jurisdiction under the Federal Declaratory Judgments Act.  *Brillhart*, 316 U.S. at 494.  That fact alone distinguishes *Brillhart* from the present case.  The Federal Declaratory Judgments Act confers a "unique breadth of leeway" upon the district courts in

deciding whether to exercise their jurisdiction that "distinguish[es] the declaratory judgment context from other areas of law in which concepts of discretion surface." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286–87 (1995).  Unlike an action under the FDJA, the balance of considerations will generally tip in favor of exercising jurisdiction under the FAA.  *See PainWebber*, 276 F.3d at 207.  Moreover, Mr. Saint Martin uses language from *Brillhart* to suggest that it would be inappropriate to litigate arbitration issues in federal and state court concurrently.  [*See* R. 11-1 at 9.]  But "the desire to avoid litigating a single issue in multiple forums is insufficient to overcome the strong federal policy supporting arbitration." *PainWebber*, 276 F.3d at 207.

Mr. Saint Martin has not shown an exceptional circumstance that would compel the Court to fail to exercise jurisdiction conferred on it by Congress.  *See id.* at 206.  In the absence of such a showing, the Court will honor its "virtually unflagging obligation" to exercise jurisdiction where it validly exists.  *See Colo. River*, 424 U.S. at 817.

**3**

Likewise, Mr. Saint Martin's Rule 12(b)(7) argument is foreclosed by prior decisions of this Court.  Mr. Saint Martin argues that two of the parties to the underlying state action, Ms. Clark and Legacy Health Services, are necessary and indispensable to the present petition to enforce the arbitration agreement.  [R. 11-1 at 10.]  While Ms. Clark and Legacy Health are necessary parties, they are not indispensable, which means the case can move forward.

Motions brought under Rule 12(b)(7) assert the failure to join a party under Rule 19 as a defense.  *Petersen*, 2020 U.S. Dist. LEXIS 103179, at *2.  Courts do not apply Rule 19 in a rigid manner.  *Keweenaw Bay Indian Cmty. Vill. v. Michigan*, 11 F.3d 1341, 1346 (6th Cir. 1993). Instead, these motions are "governed by the practicalities of the individual case."

Certain parties must be joined to a proceeding for it to move forward.  Fed. R. Civ. P. 19(a).  Identifying these parties entails a three-part analysis.  *See Sch. Dist. v. Sec'y of the U.S. Dep't of Educ.*, 584 F.3d 253, 264 (6th Cir. 2009) (en banc).  "[W]hether a party is indispensable for a just adjudication requires a determination regarding whether the absent party is necessary to the litigation; if so, whether the absent party can be joined in the litigation; and if joinder is infeasible, whether the lawsuit can nevertheless proceed 'in equity and good conscience.'"  *Id.* (quoting *Kickapoo Tribe v. Babbitt*, 43 F.3d 1491, 1494 (D.C. Cir. 1995)).  If the party is not deemed indispensable under this test, "that potential party need not be joined and the action can proceed with the original litigants."  *PaineWebber*, 276 F.3d at 201.

### a

The Court must first determine whether Ms. Clark and Legacy Health are "necessary to the action and should be joined if possible."  *Soberay Mach. & Equip. Co. v. MFR Ltd.*, 181 F.3d 759, 763–64 (6th Cir. 1999).  A party may be required for these purposes in two ways.  The party is necessary if "in that person's absence, the court cannot accord complete relief among existing parties . . . ."  Fed. R. Civ. P. 19(a)(1)(A).  Alternatively, the party could be required if "that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the parties absence may . . . as a practical matter impair or impede the person's ability to protect the interest[] or leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest."  Fed. R. Civ. P. 19(a)(1)(B)(i)–(ii).  Mr. Saint Martin argues that Ms. Clark and Legacy Health satisfy either option.  [R. 11-1 at 12.]

Ms. Clark and Legacy Health are not necessary under the first approach.  The Court's ability to accord complete relief "is determined on the basis of those persons who are already

12

parties, and not as between a party and the absent person whose joinder is sought." *Sch. Dist.*, 584 F.3d at 265 (quoting *Angst v. Royal Maccabees Life Ins. Co.*, 77 F.3d 701, 705 (3d Cir. 1996)).  Mr. Saint Martin's arguments under this prong erroneously focus on Ms. Clark and Legacy Health rather than on the adequacy of relief as to the existing parties.  In his view, "[w]ithout [Ms. Clark's and Legacy Health's] presence in an arbitration or in an action in this Court . . . the [state court case] against Ms. Clark and Legacy Health . . . would be left outstanding . . . ."  [R. 11-1 at 12.]

Presumably, Mr. Saint Martin's concern is that, if the Court ruled in his favor and held the arbitration agreement to be invalid, he would have to relitigate the issue in state court as to Ms. Clark and Legacy Health.  But concerns about subsequent litigation against absent parties do not make those parties necessary under Rule 19.  *See Sch. Dist.*, 584 F.3d at 265 ("[E]ven if some future litigation were likely . . . the 'possibility that the successful party to the original litigation would have to defend its rights in a subsequent suit by the [absent party] does not make it a necessary party to the action.'").  Because the Court could offer meaningful relief to the present parties, Ms. Clark and Legacy Health are not necessary under Rule 19(a)(1)(A).  *Id.* (citing *Smith v. United Bhd. of Carpenters & Joiners of Am.*, 685 F.2d 164, 166 (6th Cir. 1982)).

However, Ms. Clark and Legacy Heath qualify as necessary parties under Rule 19(a)(1)(B).  The second prong protects existing parties from being subjected to "a substantial risk of incurring . . . inconsistent obligations . . . ."  Fed. R. Civ. P. 19(a)(1)(B)(ii).  An absent party to an arbitration agreement can be a necessary party for these purposes.  *PaineWebber*, 276 F.3d at 201.  "If a federal court and a state court reached different conclusions regarding whether the arbitration clauses apply," the state court plaintiff could "be faced with inconsistent procedural remedies against the alleged joint tortfeasors."  *Id.*  The same logic applies here.  If

this Court and the Fayette Circuit Court reach different conclusions regarding the enforceability of the arbitration agreement, Mr. Saint Martin could be forced to pursue his tort claims via litigation as to some defendants and through arbitration as to others.  Ms. Clark and Legacy Health are, therefore, necessary parties.  *See Peterson*, 2020 WL 3130292, at *5.

**b**

Having determined that Ms. Clark and Legacy Health are necessary parties, the Court must assess the feasibility of joining them to this action.  *Sch. Dist.*, 584 F.3d at 264.  This step contemplates "whether the party is subject to personal jurisdiction and can be joined without eliminating the basis for subject matter jurisdiction."  *PaineWebber*, 276 F.3d at 201.  The inquiry can end if the basis for subject matter jurisdiction is diversity of the parties and the potential joinder would destroy complete diversity.

Here, Ms. Clark is a citizen of Kentucky.  [R. 11-1 at 7–8.]  Her inclusion in this litigation, given Mr. Saint Martin's Kentucky citizenship, would be fatal to the Court's power to hear the case.  *See Caterpillar Inc.*, 519 U.S. at 68 n.3.  This step is, therefore, "easy to resolve." *Petersen*, 2020 WL 3130292, at *5.  It is impossible to join Ms. Clark to this action.

**c**

Because a necessary party to this litigation cannot be joined, the Court must determine whether the lawsuit can still proceed in equity and good conscience.  *Sch. Dist.*, 584 F.3d at 264. Frequently, courts refer to this analysis as "determining whether a necessary party is also indispensable."  *PaineWebber*, 276 F.3d at 202.  Rule 19(b) lists four relevant factors.  *Id.*  First, the Court must decide "the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties[.]"  Fed. R. Civ. P. 19(b)(1).  Next, the Court must consider tools at its disposal to lessen the potential prejudice.  *See* Fed. R. Civ. P. 19(b)(2).  The

Court must then question "whether a judgment rendered in the person's absence would be adequate[.]" Fed. R. Civ. P. 19(b)(3). Last, the Court must assess "whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder." Fed. R. Civ. P. 19(b)(4).

Under the first factor, Mr. Saint Martin argues that a judgment in this case would be "highly prejudicial" to himself, Ms. Clark, and Legacy Health. The Court is unconvinced. For his prejudice, Mr. Saint Martin complains that he might be required to proceed in two courts simultaneously, at great expense. [R. 11-1 at 15.] Facing a nearly identical argument, the Sixth Circuit determined that the potential prejudice was minimal. *PainWebber*, 276 F.3d at 202. Mr. Saint Martin exposed himself to the potential of paying for litigation in two courts when he chose to sue rather than to arbitrate. *See id.* Moreover, Mr. Saint Martin's potential exposure to inconsistent decisions regarding the arbitration contract is greatly diminished by the fact that he is the state court plaintiff. *See id.* (discussing *Bio-Analytical Servs., Inc. v. Edgewater Hosp., Inc.*, 565 F.2d 450, 453 n.3 (7th Cir. 1977)). As the plaintiff, Mr. Saint Martin does not face potential liability in state court. *See id.* at 202–03.

For their prejudice, Mr. Saint Martin is concerned that Ms. Clark and Legacy Health would be bound by this Court's decision on the enforceability of the arbitration contract in the state court action.[4] [R. 11-1 at 14.] But the potential for "inconsistent legal obligations that might result from conflicting interpretations of . . . arbitration clauses" due to piecemeal litigation in state and federal court "is a necessary and inevitable consequence of the FAA's policy that strongly favors arbitration." *PainWebber*, 276 F.3d at 202–03. The possibility that "federal and state courts will reach conflicting interpretations of . . . arbitration clauses does not

---

[4] Mr. Saint Martin also believes that "Ms. Clark will be prejudiced by having to defend herself in state court without the presence of her employer." [R. 11-1 at 13.] But Mr. Saint Martin makes no effort to show how the presence of Ms. Clark's employer in the proceeding against her would benefit her. Accordingly, the Court has no reason to believe that Ms. Clark's employer's absence will harm her.

present the degree of prejudice necessary to support the conclusion that [an absent tortfeasor] is an indispensable party." *Id.*

Moreover, Mr. Saint Martin's opinion that this Court's ruling would bind the state court may be overstated. The doctrine of res judicata "preclude[s] parties from contesting matters that they have had a full and fair opportunity to litigate." *Montana v. United States*, 440 U.S. 147, 153 (1979). The doctrine has an important caveat. "A person who was not a party to a suit generally has not had a 'full and fair opportunity to litigate' the claims and issues settled in that suit. The application of claim and issue preclusion to nonparties thus runs up against the 'deep-rooted historic tradition that everyone should have his own day in court.'" *Taylor v. Sturgell*, 553 U.S. 880, 892–93 (2008) (quoting *Richards v. Jefferson Cnty.*, 517 U.S. 793, 798 (1996)). While this rule has exceptions, they only apply in discrete, limited circumstances. *Id.* at 898. Mr. Saint Martin makes no effort to argue that this case would fall into one of these exceptions.

And for good reason. Res judicata should generally not be applied to force a person to arbitrate a claim unless traditional principles of contract law show that they agreed to do so. *See Richmond Health Facilities v. Nichols*, 811 F.3d 192, 200 (6th Cir. 2016). It is unclear to the Court why a finding that, for example, Cambridge Place agreed to the arbitration agreement would compel the state court to find that Ms. Clark also agreed to it. Absent a more concrete showing of potential harm, Mr. Saint Martin's preclusion as prejudice theory fails.

Moving to the next factor, Mr. Saint Martin argues that the Court lacks tools to lessen the potential prejudice of any judgment in this case. [R. 11-1 at 14.] He may, or may not, be correct. Where the potential prejudice is low, mitigation bears less weight in the analysis. *PainWebber*, 276 F.3d at 205. Mr. Saint Martin's concerns as to this prong are not particularly persuasive. *Petersen*, 2020 WL 3130292, *6.

16

Under the third factor, the Court must consider whether a judgment rendered in Ms. Clark and Legacy Health's absence would be adequate.  Fed. R. Civ. P. 19(b)(3).  Mr. Saint Martin's only argument on this point is a quote from Judge Bright's dissent in *PainWebber*.  [*See* R. 11-1 at 14.]  Because the Court is bound by the majority opinion from that case, Mr. Saint Martin's citation is all hat and no cattle.  As the majority explained, "the possibility of" Mr. Saint Martin "having to arbitrate his claims against" Cambridge Place "while proceeding with his claims against" Ms. Clark and Legacy Health "in state court does not render a judgment" in this action inadequate.  *PainWebber*, 276 F.3d at 205.

The last factor tips in Mr. Saint Martin's favor.  If the Court dismissed this case, the Fayette Circuit Court would be an adequate forum in which Mr. Saint Martin could litigate his tort claims and all the parties, including Ms. Clark and Legacy Health, could resolve the arbitration issue.  *See id.*  But the mere existence of an alternative forum is not determinative.  *Id.* If this final factor could tip the scale, unscrupulous litigants could prevent federal courts from enforcing arbitration clauses in diversity cases by including a nondiverse party in the underlying state suit.  *Id.*  Such a result would undermine the scheme that Congress created by passing the FAA.  *See id.* at 205–06.  Based on the balance of the factors and this major policy concern, Ms. Clark and Legacy Health are not indispensable parties.  *Id.* at 206.

In a final effort to overcome the mountain of precedent in his path, Mr. Saint Martin asks the Court to narrow *PainWebber* to its facts.  He argues that the parties in *PainWebber* were subject to two separate agreements, one of which could be litigated in state court without going to arbitration.  [R. 11-1 at 15–16.]  Here, the same arbitration agreement will be at play in both the federal and state litigation.  *Id.* at 16.  For an attempt to persuade a district court to disregard applicable precedent from its circuit, this argument is remarkably unencumbered by the need to

cite to either the *PainWebber* decision itself or to persuasive caselaw.  [*See* R. 11-1 at 15–16.]  It also fails to move the needle.  *PainWebber* regarded the potential for two courts in parallel proceedings to interpret the same arbitration agreement as a feature of the FAA, not a bug.  *See PainWebber*, 276 F.3d at 203 ("[T]he possibility of piecemeal litigation is a necessary and inevitable consequence of the FAA's policy that strongly favors arbitration."); *see also id.* (explaining that a "fear that the federal and state courts will reach conflicting interpretations of the arbitration clauses does not present the degree of prejudice necessary to support a conclusion that [an absent defendant] is an indispensable party.").

To recap, Mr. Saint Martin has shown that Ms. Clark and Legacy Health are necessary parties.  *See supra* Section II.A.3.a.  Likewise, their joinder is not feasible because Ms. Clark would destroy the Court's subject matter jurisdiction.  *See supra* Section II.A.3.b.  But Mr. Saint Martin fails to demonstrate that Ms. Clark and Legacy Health are indispensable.  For that reason, this case will not be dismissed.  *See PaineWebber*, 276 F.3d at 201.

**B**

Finally, the Court reaches Mr. Saint Martin's substantive challenge to the Section Four Motion.  Mr. Saint Martin argues that the scope of authority conferred by his power of attorney did not grant his brother the ability to sign an arbitration agreement on his behalf.  So, Mr. Saint Martin believes that the Court should not enforce the arbitration agreement.[5]  Resolution of the

---

[5] Mr. Saint Martin argues that the Court cannot consider the arbitration agreement at all because "[e]very document offered into evidence must be authenticated . . . ."  [R. 11-1 at 32.]  In support, Mr. Saint Martin cites several Kentucky rules of evidence and state decisions on authentication of documents.  *See id.* at 32–34.  But the Federal Rules of Evidence control this diversity case.  *See Legg v. Chopra*, 286 F.3d 286, 289 (6th Cir. 2002) (explaining that, under the *Erie* doctrine, the Federal Rules of Evidence are procedural rather than substantive, meaning the state rules do not supplant them in a diversity action).  Federal courts can consider an "agreement's appearance, contents, substance, and characteristics" to determine their authenticity.  *Petersen*, 2020 U.S. Dist. LEXIS 103179, at *33 (citing Fed. R. Evid. 901(b)(4)).  The arbitration agreement provided by Cambridge Place is consistently paginated, bears Mr. Saint Martin's name, and has a signature consistent with his brother.  *Compare* [R. 1-4] *with Petersen*, 2020 U.S. Dist. LEXIS 103179, at *33–34.  Mr. Saint Martin makes no argument to the contrary.  [R. 11-1 at 32–33.]  Accordingly, his arguments regarding the need for supporting testimony or foundational evidence are unavailing.  *See id.*

issue turns on state agency and contract law, to the extent they are not preempted by the Federal Arbitration Act.

As discussed, Mr. Saint Martin's argument must be reviewed under Rule 56's standards for summary judgment. *See Boykin*, 4 F.4th at 838. Federal courts grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, some factual disputes between the parties do not prevent summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). Only facts that affect the outcome of the suit under governing law preclude the entry of summary judgment. *Id.* at 249. The facts must also be genuine in that, if proven at trial, a reasonable jury could rely on them to return a verdict for the non-moving party. *Id.*

To be disputed, a party need not prove a material fact conclusively, but the non-moving party must present sufficient probative evidence to require a judge or jury to resolve the matter at trial. *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968). A court construes the evidence in the light most favorable to the non-moving party. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425, 427 (6th Cir. 1962).

## 1

Under the FAA, arbitration agreements are "valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Arbitration agreements can be "invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability . . . .'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)). Likewise, state

law governs whether the parties formed a binding and enforceable agreement. *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009).

To form a valid contract, Kentucky law requires the voluntary, complete assent of the parties. *Conners v. Eble*, 269 S.W.2d 716, 717–18 (Ky. 1954). A person's assent can be provided by an attorney-in-fact acting under a power of attorney agreement. *Extendicare Homes, Inc. v. Whisman*, 478 S.W.3d 306, 327 (2015), *rev'd on other grounds sub nom Kindred Nursing Ctrs. Ltd. v. Clark*, 581 U.S. 246 (2017). However, if the attorney-in-fact signs a contract beyond the scope of authority conferred in the power of attorney, the contract at issue is invalid. *Id.*

Here, the enforceability of Mr. Saint Martin's alleged arbitration agreement with Cambridge Place depends on the scope of authority that he granted his brother via the power of attorney executed in 2013. *See Ping v. Beverly Enters., Inc.*, 376 S.W.3d 581, 590 (Ky. 2012). Under a durable power of attorney agreement, a principal empowers an agent to perform certain acts on his behalf after disability or incapacity. *Id.* at 591–92. The scope of the authority created is "left to the principal to declare, and generally that declaration must be express." *Id.* at 592. The agent's authority will generally be confined within discrete "types of transaction[s] expressly authorized in the document . . . ." *Id.* For example, a principal might authorize his agent to "make, execute, and deliver deeds." *E.g.*, *Kindred Nursing Ctrs. v. Wellner*, 533 S.W.3d 189, 193 (Ky. 2017).

Additionally, powers of attorney can include broader powers to enable the principal to perform the listed tasks. *See Ping*, 376 S.W.3d at 590. These expand the scope of the document to include "authority to do acts which are incidental to [the specific item] . . . or which are reasonably necessary to accomplish [them]." *Id.* (quoting *Restatement (Second) of Agency* § 35

20

(1958)).  For example, the document might allow the agent "to do and perform any, all, and every act and thing whatsoever requisite and necessary to be done . . . as I might or could do if personally present . . . ."  *E.g.*, *id.* at 586.

But implied powers under a POA have limits.  They should not extend so broadly as to render the enumerated list of powers a mere surplusage.  *See id.*  And they should not be construed to permit the agent to "create legal consequences for a principal that are significant and separate from the transaction specifically directed by the principal."  *Id.* at 593 (emphasis removed).  Thus, the enforceability of the arbitration agreement at issue depends on whether Mr. Saint Martin's POA expressly or impliedly authorized his brother to sign an arbitration agreement.  *See id.* at 593–94.

2

These state law principles, however, must not run afoul of federal law.  The Federal Arbitration Act preempts any state law that explicitly prohibits arbitration of a type of claim.  *Concepcion*, 563 U.S. at 341.  The FAA also displaces any state law that attempts to covertly disfavor arbitration.  *See id.*  States cannot target arbitration by designing rules that appear tailored to the unique features of arbitration agreements.  *Kindred Nursing Ctrs.*, 581 U.S. at 251.  For example, a state court cannot find a contract to be unconscionable or void due to public policy because the parties agree to resolve a dispute outside of the presence of a jury.  *Concepcion*, 536 U.S. at 342.

Thus, the FAA "establishes an equal treatment principle" that preempts "legal rules that 'apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.'"  *Kindred Nursing Ctrs.*, 581 U.S. at 251.  This equal footing requirement extends to attacks on the valid formation of a contract.  *Id.* at 254–55.  The rules of interpretation that apply

21

generally to the scope of power of attorney agreements must equally govern whether arbitration falls within that scope.  *See id.* at 255–56.

3

The equal treatment principle has been problematic in Kentucky.  The United States Supreme Court recently reversed a Kentucky Supreme Court decision involving formation of an arbitration agreement via a power of attorney.  To fully understand the nuanced intersection of Kentucky and federal law on this topic, a review of the reversal and its fallout is necessary.

Kentucky formerly enforced a clear statement rule that required a power of attorney to specifically state that it authorized waiving the right to trial to permit an attorney-in-fact to sign an arbitration agreement.  *Whisman*, 478 S.W.3d 306, 327 (2015), *rev'd sub nom Kindred Nursing Ctrs.*, 581 U.S. at 246.  The decision creating that rule considered two POAs.  The Kentucky Supreme Court found the language of the first contract, the Wellner POA, too narrow to imply the power to sign an arbitration agreement.  *See id.* at 325–26.  That POA permitted the attorney-in-fact "to demand, sue for, collect, recover, and receive all debts, moneys, interest and demands now due or that may hereafter be or become due to me (including the right to institute legal proceedings therefor)" and to "make, execute, and deliver . . . contracts of every nature in relation to both real and personal property . . . ."  *Id.* at 319.  The Court concluded that neither provision implied the authority to sign an arbitration agreement as incidental or necessary.  *Id.* at 325–26.

By contrast, the Clark POA granted the attorney-in-fact "full power . . . to transact, handle, and dispose of all matters affecting me and/or my estate in any possible way," including authority to "draw, make, and sign in my name any and all . . . contracts . . . ."  *Id.* at 335.  The Kentucky Supreme Court found this language to be an "extremely broad, universal delegation of

22

authority" such that "it would be impossible to say that entering into [an] arbitration agreement was not covered." *Id.* at 327.  Nevertheless, the Court held that, absent an explicit statement authorizing the attorney-in-fact to "waive Olive Clark's constitutional rights of access to the courts," any arbitration agreement entered into on her behalf was invalid.  *Id.* at 332.

The Court reasoned that the Commonwealth's Constitution guarantees its citizens the right of access to the courts and the right of trial by jury.  *Id.* at 328 (citing Ky. Const. §§ 7, 14). To protect those rights, the Court refused to infer the specific authority to enter into an arbitration agreement.  *Id.*  "[T]he power to waive generally such fundamental constitutional rights must be unambiguously expressed in the text of the power-of-attorney document in order for that authority to be vested in the attorney-in-fact."  *Id.*

On review of the Kentucky decision, the United States Supreme Court held that the FAA precludes this rule.  *Kindred Nursing Ctrs.*, 581 U.S. at 255.  The heightened specificity requirement failed to place arbitration agreements on equal footing with other contracts by impeding "the ability of attorneys-in-fact to enter into arbitration agreements."  *Id.*  Although the Kentucky Supreme Court styled its rule as applying to any contract that waived fundamental rights, the United States Supreme Court believed the opinion was an attempt to covertly target arbitration agreements by purporting to include other disfavored "contracts that (oh so coincidentally) have the defining features of arbitration agreements."  *Id.* at 251.

Writing for the majority, Justice Kagan took a pragmatic approach to reviewing Kentucky's rule.  While the Kentucky Supreme Court claimed that its rule would apply to other contracts that waive fundamental rights, Justice Kagan asked "what other rights, really?"  *Id.* at 253.  The Kentucky Constitution protects "the 'inherent and inalienable' rights to 'acquir[e] and protect[] property' and to 'freely communicat[e] thoughts and opinions.'"  *Id.* (quoting Ky.

23

Const. § 1)).  But Kentucky courts do not apply a specific statement rule to powers of attorney that delegate authority to "sell [the] principal's furniture" or "commit [the] principal to a non-disclosure agreement."  *Id.*  In reality, Kentucky's rule was "too tailor-made to arbitration agreements—subjecting them, by virtue of their defining trait[,]" the waiver of a right to proceed in court—"to uncommon barriers . . . ."  *Id.* at 252.

Having invalidated the specific statement rule, Justice Kagan turned to the two power of attorney agreements at issue.  If, under generally applicable contract law, the text of a power of attorney is broad enough to include arbitration agreements in its scope, then Kentucky law cannot invalidate an arbitration agreement signed by the attorney-in-fact.  *See id.* at 256 (discussing the Clark POA).  Justice Kagan therefore reversed Kentucky's decision and mandated arbitration under the Clark POA.  *Id.*  However, language that is too narrow to imply authority to enter into an arbitration agreement can still defeat the enforcement of the power of attorney agreement.  *See id.* (discussing the Wellner POA).  The Wellner POA may, under general contract principles, have been too narrow to include arbitration in its scope.  *Id.*  Suspicious that Kentucky's tainted clear statement rule influenced the narrow reading of the Wellner POA, Justic Kagan remanded it for further consideration.  *Id.*

Returning to the issue, the Kentucky Supreme Court considered the Wellner POA.  It granted (1) "the power 'to demand, sue for, collect, recover and receive all debts, monies, interest and demands whatsoever now due or that may hereafter be or become due to me (including the right to institute legal proceedings therefor);'" and (2) "the power 'to make, execute and deliver deeds, releases, conveyances and contracts of every nature in relation to both real and personal property, including stocks, bonds, and insurance.'"  *Kindred Nursing Ctrs. v. Wellner*, 533 S.W.3d 189, 193 (Ky. 2017).  The Court remained convinced that these enumerated

powers were too narrow to imply authority to bind Mr. Wellner to arbitration.  *Id.* at 194.  This time, the Court distinguished between the power to bind Mr. Wellner to arbitrate existing and future claims.  *See id.* at 193.  The language regarding instituting legal proceedings allowed the attorney-in-fact to sign an arbitration agreement for existing claims but not to sign a "pre-dispute arbitration agreement in the context of admitting him to a nursing home."  *Id.*  "That act was in no way connected to the pursuit of any claim of" Mr. Wellner's.  *Id.*

As to the language regarding Mr. Wellner's property, the Court acknowledged that "a personal injury claim is . . . personal property."  *Id.* at 194 (quoting *Whisman*, 478 S.W.3d at 325–26).  And "the power to make contracts relating to personal property authorizes [an] agent to arbitrate the principal's personal injury claims."  *Id.*  But a pre-dispute arbitration agreement waives future rather than existing claims, and so it involves waiving the "constitutional rights" to access to the courts, not "personal property."  *Id.*  Notably, a significant portion of the Kentucky justices dissented, based on this distinction between pre-dispute arbitration and existing claims.  *Id.* at 195 (Hughes, J., dissenting) ("An arbitration agreement, regardless of when signed or whether characterized as pre- or post-dispute, has absolutely no reason to exist unless there is a current or potential claim to be pursued or defended against.").

### 4

So, Kentucky law now asks three questions regarding the scope of a POA.  Does the POA include a grant of authority that is so broad that it must encompass an agreement to arbitrate claims?  *See Wellner*, 533 S.W.3d at 192 (discussing the Clark POA).  If not, do any of the enumerated powers, when combined with the incidental grants of authority, imply the power to waive the right of access to the courts for existing disputes.  *LP Louisville E., LLC v. Patton*, 651 S.W.3d 759, 769–70 (Ky. 2020) (explaining that a grant of "all powers as are necessary or

desirable" related to healthcare decisions implied the power to sign an arbitration agreement required for admission to a nursing home) And does that language explicitly authorize the attorney-in-fact to waive the right to litigate future disputes? *See Wellner*, 533 S.W.3d at 193. The Court considers these questions, against the background issue of federal preemption, in turn.

### a

Mr. Saint Martin's POA contains three clauses that the Kentucky cases identify as relevant: the "all powers necessary," the "personal property," and the "health care decisions" provisions. [R. 1-4 at 2, 4, 5.] Cambridge Place claims that the all-powers-necessary clause is sufficiently broad to empower Mr. Wilson to sign an arbitration agreement on Mr. Saint Martin's behalf. [R. 12 at 17.] While the language is broad, it does not exist in a vacuum. Construed in light of the entire agreement, the powers clause grants Mr. Wilson latitude to make decisions reasonably necessary to carry out the specifically enumerated duties set forth elsewhere in the agreement. *See Ping*, 376 S.W.3d at 592.

The language at issue reads:

> My Agent shall have all powers as are necessary or desirable to provide for my support, maintenance, health, emergencies, and urgent necessities. To make, execute and deliver for me and in my name, any and all deeds, documents writings, checks, drafts and notes, of all kinds and descriptions;
>
> To generally do and perform any and all acts and things whatsoever in and about my estate, property and affairs, in all respect [sic] and as fully as I could do if personally present . . . .

[R. 1-4 at 4.] Cambridge Place asks the Court to read this provision in isolation, as a stand-alone grant of almost universal authority, unconnected to the specific enumerated areas of authority. [*See* R. 12 at 18–19 (attempting to distinguish the *Ping* POA).] This argument fails for three reasons.

First, Kentucky law disfavors universal grants of authority under a durable POA.  Unlike a legal guardian, an attorney-in-fact does not answer directly to a court.  *Rice v. Floyd*, 768 S.W.2d 57, 59 (Ky. 1989).  Under a durable power of attorney, an attorney-in-fact is "answerable and accountable only to the principal who may be mentally disabled."  *Id.*  For this reason, "even a 'comprehensive' durable power would not be understood as implicitly authorizing all the decisions a guardian might make on a ward."  *Ping*, 376 S.W.3d at 592 (citing *Rice*, 768 S.W.2d at 59).  Reading the all powers necessary clause as having no limit would violate this preference for limited authority under a durable power of attorney.

Second, Cambridge Place's preferred reading would render the specific provisions of the contract a nullity.  "[I]t is a fundamental rule that a written agreement generally will be construed 'as a whole, giving effect to all parts and every word in it if possible.'"  *Patton*, 651 S.W.3d at 769 (quoting *City of Louisa v. Newland*, 705 S.W.2d 916, 919 (Ky. 1986)).  "[A]n agent's authority under a power of attorney is to be construed with reference to the types of transactions expressly authorized in the document . . . ."  *Id.*  "[G]eneral expressions used in authorizing an agent are limited in application to acts done in connection with the act or business to which the authority primarily relates."  *Id.*  Broad statements of powers under a POA generally authorize the agent to exercise authority incidental to enumerated powers to aid in accomplishing the specific grants.  *Id.*

In addition to its general language, Mr. Saint Martin's POA authorized his attorney in fact to: (1) "acquire ownership or possession of tangible personal property;" (2) sell, exchange, or convey . . . tangible personal property;" (3) "enforce, by litigation or otherwise, a . . . claim . . . with respect to tangible personal property;" (4) engage in banking transactions; (5) engage in insurance transactions; and (6) "[t]o make healthcare decisions for me."  [R. 1-4 at 2–5.]  The

broad statements contained within the "all powers necessary" clause must be read within the context of these specific areas of authority. *Ping*, at 376 S.W.3d at 586–87 (describing a set of general powers and then a list of enumerated areas of authority), 592 (explaining that the general powers are incidental to the specific areas of authority); *Patton*, 651 S.W.3d at 763 (reciting broad powers and then limited areas of authority), 769 (applying the broad powers to the specified authority over healthcare decisions). Cambridge Place would read the broad language regarding "executing documents 'of all kinds and descriptions'" in a vacuum as empowering Mr. Wilson to sign an arbitration agreement. [R. 12 at 18.] But if Mr. Wilson had the power to sign any document whatsoever, there would be no need to specify acquiring tangible property or signing insurance paperwork. Instead, Mr. Wilson had the power to sign any document related to tangible property, insurance, or other specifically enumerated areas of authority.

Against this, Cambridge Place relies on the Kentucky Supreme Court's interpretation of the Clark POA. [R. 12 at 15.] The Kentucky Supreme Court's decision on this POA is something of an outlier. Unlike in every other case identified by the parties, the Court was willing to read a durable power of attorney's general powers language as granting nearly unlimited authority to the attorney-in-fact. *Whisman*, 478 S.W.3d at 427.

Two phrases taken together—"to transact, handle, and dispose of all matters affecting me and/or my estate in any possible way" and "to do and perform for me in my name all that I might if present"—made it "impossible to say that entering into a pre-dispute arbitration agreement was not covered." *Id.* Only the clear statement rule prevented the Clark POA from covering an arbitration agreement. *See Kindred Nursing Ctrs.*, 581 U.S. at 256. After Justice Kagan remanded the case on other grounds, the Kentucky Court observed that "the vague and all-encompassing language of the Clark POA" led to its decision. *See Wellner*, 533 S.W.3d at 192

28

& n.4.  But this confirmation was akin to telling a man who is soaking wet to carry an umbrella.  Justice Kagan reversed the Kentucky Supreme Court on the Clark POA and did not remand the issue for further consideration.  *See Kindred Nursing Ctrs.*, 581 U.S. at 256.

In the time since its decisions on the Clark POA, the Kentucky Supreme Court has had occasion to consider one other power of attorney document, and it reiterated its commitment to reading general grants of power in light of the specifically enumerated areas of authority.  *See Patton*, 651 S.W.3d at 769.  Given that return to form, it appears that Cambridge Place makes too much of the Clark POA.  True, the Kentucky Supreme Court stated that the general powers portion of the Clark POA was extremely broad and vague.  *Wellner*, 533 S.W.3d at 192.  But the enumerated powers also included the authority to "sign in my name any and all . . . contracts . . . ."  *Whisman*, 478 S.W.3d at 318.  With that additional context, the Court does not appear to have strayed as far from its principals announced in *Ping* as Cambridge Place claims.  Rather, both the general powers and the specific enumerations were so broad as to inevitably authorize arbitration.  By contrast, Mr. Saint Martin's power of attorney authorized more discrete transactions, such as signing insurance contracts.  Kentucky law requires these specific portions to limit the general language.  *Ping*, 376 S.W.3d at 593–94.

Third, Cambridge Place mischaracterizes the decisions in *Ping* and *Patton* by focusing on the general language to the detriment of the specific.  Both cases involved POAs that specifically granted authority over healthcare decisions.  *Patton*, 651 S.W.3d at 763; *Ping*, 376 S.W.3d at 587.  In *Patton*, the attorney-in-fact had to sign a POA as a prerequisite to admit his principal into a long-term care facility.  *Patton*, 651 S.W.3d at 770.  Because the choice was either arbitration or no long-term care, the Court found entering into the arbitration agreement to be an act incidental to a decision on healthcare.  *Id.*  By contrast, in *Ping*, the arbitration agreement was

not required to enroll in the nursing home. *Ping*, 376 S.W.3d at 594. The Court therefore saw no connection between the explicit grant of healthcare authority and an agreement to waive access to court. *See id.* (explaining that Ms. Ping was not authorized to waive "where there was no reasonable necessity to do so, her mother's right of access to the courts.").

Cambridge Place minimizes the importance of the mandatory nature of the POA in *Patton*. [R. 12 at 18.] It argues that the language of the Patton POA authorized the agent "to exercise <u>all</u> powers necessary or desirable to provide for the principal's maintenance and health." *Id.* But this statement shows a fundamental misunderstanding of the case. Mr. Patton's attorney-in-fact had authority to sign the arbitration agreement because it was "necessary [and] non-optional . . . in order to obtain [Mr. Patton's] admittance into [the] facility . . . ." *Id.* That necessity connected the arbitration agreement to a specifically enumerated power, the ability to provide for health care. Once a connection existed, the attorney-in-fact could wield his broader powers to accomplish tasks incidental to making health care decisions. Without a showing that Mr. Saint Martin was offered admission into Cambridge Place with a similar arbitration precondition, even an extremely broad grant of power over Mr. Saint Martin's health would not connect to arbitration. *See Ping*, 376 S.W.3d at 593.

In sum, the language of general authority in Mr. Saint Martin's POA did not, alone, authorize Mr. Wilson to sign the instant arbitration agreement. The validity of that contract depends on whether the specifically enumerated transactions, along with any incidental powers, brings arbitration within the scope of the POA.

**b**

Mr. Saint Martin's grant of authority over his personal property brings arbitration within the scope of the document. A personal injury claim is a chose-in-action, which Kentucky law

regards as personal property.  *Wellner*, 533 S.W.3d at 194.  Therefore, POAs that authorize "the power to make contracts relating to personal property authorize[] the agent to arbitrate the principal's personal injury claim."  *Id.*

Mr. Saint Martin's POA granted Mr. Wilson "all powers of an absolute owner over my assets . . . ."  [R. 1-4 at 1.]  Specifically, Mr. Wilson received "[p]ower relating to tangible personal property transactions," including the power to "sell, exchange, convey . . . or otherwise dispose of tangible personal property . . . ."  *Id.* at 2.  Accordingly, Mr. Wilson had the power to dispose of any personal injury claims possessed by Mr. Saint Martin, which authorized Mr. Wilson to bind Mr. Saint Martin to arbitrate these claims.  *See Wellner*, 533 S.W.3d at 194.

That said, Kentucky law continues to distinguish between personal injury claims that existed at the time the POA was executed and any which arise thereafter.  *See id.*  ("pre-dispute arbitration contract[s] [do] not relate to any property rights . . . .")  Because the claim does not yet exist, it is not yet property.  *See id.*  Therefore, executing a pre-dispute arbitration agreement does not "dispose of tangible personal property," as contemplated by Mr. Saint Martin's POA.  *Compare* [R. 1-4 at 2] *with Wellner*, 533 S.W.3d at 194 (holding that a POA that authorized an agent "make, execute and deliver deeds, releases, conveyances and contracts of any nature in relation to Joe's property" did not empower the agent to execute a pre-dispute arbitration agreement) (cleaned up).  Pre-dispute arbitration agreements only affect "constitutional rights, which no one contends to be . . . real or personal property."  Applying Kentucky's pre-dispute, post-dispute distinction, Mr. Saint Martin's POA did not authorize Mr. Wilson to require him to arbitrate any personal injury claims that arose after he moved into Cambridge Place.  But that result depends on the distinction's consonance with federal law.

31

**c**

The pre-dispute, post-dispute distinction is preempted by federal law as it remains an oh-so-coincidental pretext to discriminate against arbitration agreements.  Recall Justice Kagan's approach to reviewing the clear statement rule.  State rules that covertly burden the formation of arbitration contracts, based on their defining features, are preempted by the FAA.  *Kindred Nursing Ctrs.*, 581 U.S. at 251.  If a rule appears tailor-made to arbitration, a reviewing court asks what other transactions it realistically could apply to.  *See id.* at 253.

So, what other dispositions of property could a before-and-after acquisition rule affect?  For example, Mr. Saint Martin's POA authorized Mr. Wilson to "create a security interest in" his personal property.  [R. 1-4 at 2 ¶ 2.]  Would a Kentucky court find that Mr. Wilson validly created a security interest on a yacht that Mr. Saint Martin owned for thirty years but refuse to allow a security interest to attach to after acquired property?  *See* Ky. Rev. Stat. Ann. § 355.9-204 (LexisNexis 2023) ("[A] security agreement may create or provide for a security interest in after-acquired collateral.").  What if Mr. Wilson attempted to use his power to "satisfy, or enforce, by litigation" a claim for a debt owed to Mr. Saint Martin that arose after they signed the arbitration agreement?  [R. 1-4 at 2.]  Would a Kentucky court find that this post-contract property interest falls outside of the scope of the POA?  *See Wellner*, 533 S.W.3d at 195 (Hughes, J., dissenting) (predicting the answer to be no).  As Justice Kagan was, this Court is skeptical.  *See Kindred Nursing Ctrs.*, 581 U.S. at 253.

Instead, the pre-dispute, post-dispute rule "is simply another attempt to single out arbitration for 'hostile' treatment under the guise of Kentucky contract and agency law." *Wellner*, 533 S.W.3d at 195 (Hughes, J., dissenting).  A defining feature of most arbitration agreements is their contemplation of disputes that will arise in the future.  *See id.* at 197–98

(discussing arbitration clauses in leases, construction contracts, and brokerage agreements, all of which commonly agree to resolve future claims via arbitration).  While the Kentucky Supreme Court claims its new rule distinguishes between property rights and constitutional rights, it continues to employ a rule tailored to the core characteristics of arbitration agreements. Accordingly, the distinction between pre-dispute and post-dispute arbitration agreements under *Kindred Nursing Centers v. Wellner* is preempted by the Federal Arbitration Act.  *See Kindred Nursing Ctrs.*, 533 S.W.3d at 193–94.

## 5

So, having assessed the intersection of Kentucky and federal law, did Mr. Saint Martin's POA authorize Mr. Wilson to sign the arbitration agreement?  The grant of authority to transact in personal property included personal injury claims.  *See supra* Section II.B.2.  The power to dispose of a personal injury claim brings an arbitration agreement within the scope of the POA. *See id.*  And Kentucky law cannot distinguish between pre-dispute and post-dispute arbitration agreements consistent with the FAA.  With the offending rule removed, Mr. Saint Martin's POA authorized Mr. Wilson to sign an arbitration agreement on his behalf, waiving access to court for future claims.  Accordingly, Cambridge Place and Mr. Saint Martin, through his attorney-in-fact, formed a valid arbitration agreement.

## III

The arbitration agreement that Mr. Wilson signed included all tort claims and statutory claims, which are the substance of Mr. Saint Martin's state court suit.  [R. 1 at 6; R. 1-2 at 2.] The contract covered "claims against the Facility, the Facility's employees, the Facility's medical director(s) in his/her capacity as medical director, the Facility's agents, officers, and directors."  [R. 1-2 at 1–2.]  Mr. Saint Martin's state complaint alleges that Jay Frances and

Kimberly Smith operated and managed Cambridge Place. [R. 1-3 at 3–4.] Under the plain terms of the arbitration agreement, Mr. Saint Martin must pursue his claims against Cambridge Place, Mr. Frances, and Ms. Smith via arbitration. Given the Court's satisfaction that the arbitration agreement was validly formed, nothing remains of the instant Section Four motion but to summarily compel arbitration. *See Boykin v. Family Dollar Stores of Mich., LLC*, 3 F.4th 832, 837 (6th Cir. 2021). Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. Defendant Lee Saint Martin's Motion to Dismiss **[R. 11]** is **DENIED**;

2. The Plaintiffs' request for a hearing **[R. 12]** is **DENIED** as moot;

3. The Plaintiffs' Motion to Compel Arbitration **[R. 1]** is **GRANTED**;

4. Pursuant to 9 U.S.C. § 4, Defendant Lee Saint Martin is hereby **COMPELLED** to resolve his claims against Cambridge Place Group, LLC, Cambridge Place Properties, LLC, Jay Frances, and Kimberly Smith in arbitration under the terms of the parties' agreement. The arbitration hearing and proceedings shall occur within the Eastern District of Kentucky;

5. Defendant Lee Saint Martin is hereby **ENJOINED** from proceeding in his parallel action in state court against Cambridge Place Group, LLC, Cambridge Place Properties, LLC, Jay Frances, and Kimberly Smith;

6. This is a final and appealable order; and

7. This matter is stricken from the Court's active docket.

This the 25th day of September 2023.

Gregory F. Van Tatenhove
United States District Judge